**George WHITE, on behalf of himself and all others similarly situated**

v.

**David MATHEWS, Secretary of the Department of Health, Education, and Welfare, as an Individual and in his official capacity.**

**Civ. No. H–75–34.**

United States District Court,
D. Connecticut.

Sept. 29, 1976.

Raymond R. Norko (Hartford Legal Aid Society), Hartford, Conn., for plaintiff.

Raymond L. Sweigart, Asst. U. S. Atty. Peter C. Dorsey, U. S. Atty., New Haven, Conn., Thomas Stout, Office of Gen. Counsel, Dept. of Health, Ed. & Welfare, Baltimore, Md., for defendant.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND ON MOTION TO DISMISS

CLARIE, Chief Judge.

The plaintiff, George White, brought this action on behalf of himself and other Connecticut residents who are attempting to assert claims for Social Security disability benefits under 42 U.S.C. § 423, but whose appeals from adverse agency action have been impeded by extensive delays in the scheduling and completion of hearings before an administrative law judge, as provided for in 42 U.S.C. § 405(b) and 20 C.F.R. § 404.917. Plaintiff's class was certified by this Court on July 18, 1975.[1] Defendant,

---

1. The plaintiff class includes both individuals whose initial petitions for disability have been denied by the Social Security Administration (SSA) and individuals who were at one time

the Secretary of the Department of Health, Education and Welfare (HEW), has moved for dismissal based on lack of subject matter jurisdiction and upon mootness. Plaintiff and defendant have in addition entered cross-motions for summary judgment on the merits.

The affidavits and pleadings reveal that this case is a proper one for treatment by summary judgment, there being no genuine issue as to any material fact separating the parties. Defendant's motion to dismiss is denied, since the Court finds that the case is not moot and the exercise of jurisdiction is not precluded by 42 U.S.C. §§ 405(g) and (h). The plaintiff's motion for summary judgment is granted and the Court finds that the existing delay in processing appeals from adverse agency action is so great as to deprive the plaintiff of his statutory right and his constitutional guarantee of equal protection and due process.

### FACTS

There is no dispute as to the central facts in this case, the parties having entered into a stipulation. The named plaintiff,[2] a man in his fifties, applied to the Social Security Administration (SSA) for disability benefits in July of 1972, complaining of a variety of physical disabilities, including laennec's cirrhosis and chronic and acute pancreatitis. At that time he was declared totally disabled and began to receive benefits. As a result of a periodic re-examination begun in September of 1973, however, plaintiff was informed—on December 27, 1973—that he was no longer considered disabled. His benefits were terminated as of January 31, 1974.

He then applied to have his case reconsidered by the SSA, and was informed on July 11, 1974 that his application had been denied. White then petitioned on July 29, 1974 for a hearing before an administrative law judge. No hearing was held on the matter, however, until April 29, 1975, and the final decision was not rendered thereon until May 21, 1975, when the SSA's earlier decision to terminate White's benefits was upheld.[3] In all, 306 days passed between the date of plaintiff's petition for a hearing and the issuance of the final decision.

The plaintiff's experience with the SSA appeals process is not unique. As a result of various factors discussed in more detail below, an extremely large backlog of cases has developed in the SSA's Hearings and Appeals Bureau. In April of 1975, there was a record total backlog of 113,000 pending cases nationwide.[4] The result has been a chronic delay in the disposition of appeals. During the period between January 1973 and March 1975 the average waiting period between an initial request for a hearing and the entry of a final decision was 195.2 days nationally, and 211.8 days for petitions in Connecticut [5]—or, approximately six and one-half and seven months respectively. It is of these general lengthy and persistent delays that the plaintiff complains.

---

declared disabled, but whose benefits have subsequently been terminated by the SSA on the basis of a periodic re-examination.

**2.** In addition to plaintiff White, there are two named intervenors in this case. Intervenor Alice Lockwood was denied disability status when she first applied. Lockwood's petition for a hearing before an administrative law judge was filed on October 15, 1974, but she did not receive a final decision until October 27, 1975—376 days later. Intervenor Helen Caldwell was also denied disability status on her initial application after undergoing lung cancer surgery; in her case, there was a delay of approximately six months between petition and decision, although she continued to suffer Meniere's disease, pulmonary emphysema and a depressive reaction. Her condition led a medi-

cal consultant to remark in a 1974 report that "[i]t is difficult to see how she was denied—on a strict medical!"

**3.** Since then, the administrative law judge's ruling has itself been reversed by the Appeals Council of the SSA Hearings and Appeals Bureau. White's benefits have thus been reinstated.

**4.** Defendant's Memorandum of Jan. 30, 1976, at 13. This figure represents an "all time high" for the Bureau, and has since been reduced. By June, 1976 the backlog had been lowered to 87,860. Aff. of Jan J. Sagett, July 15, 1976, at 2.

**5.** Plaintiff's Memorandum of Dec. 3, 1975, at 5.

(a) *The Social Security Disability System*

To establish disability [6] under Title II of the Social Security Act, a wage earner must provide "such medical and other evidence of the existence [of the disability] as the Secretary may require" in support of the application. 42 U.S.C. § 423(d)(5). This evidence must establish disability by means of "medically acceptable clinical and diagnostic techniques." *Id.* § 423(d)(3). And it must be shown that the disability in question is sufficiently great that

> "[the wage earner] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* § 423(d)(2)(A).

To qualify for disability benefits, then, the worker's disability must be total, such that no "substantial gainful work" opportunity exists. The level of benefit payments is based on a variety of factors, including age and the prior average monthly earnings of the worker while employed. Eligibility under Title II of the Social Security Act is not based directly on financial need.

If it is determined that an individual is not disabled, either on an initial application or as the result of a periodic re-examination, a "redetermination hearing" may be sought with the SSA to review the case.[7] This review is undertaken on the basis of forms and affidavits submitted to the Agency by the applicant; no face to face meeting takes place at this time.[8]

Should the result of the redetermination hearing be adverse to the applicant, he may then petition for a hearing before an administrative law judge.[9] At this stage a full evidentiary hearing is held with the applicant in attendance. If the result is again unfavorable, a final discretionary review may be sought before the Appeals Council of the SSA Hearings and Appeals Bureau.[10] It was this latter Council that finally overturned the original determination made with respect to plaintiff White in this case.

To judge from the number of reversals at the administrative law judge stage of appellate review the "error rate" in SSA disability determinations is substantial. The incidence of reversals by administrative law judges exceeds 50 percent of all the cases heard.[11] The reversal rate is much lower, to be sure, when measured against the total number of original denials, many of which are not appealed.[12] However with respect

6. The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."

7. Although an applicant for disability benefits initially files with the SSA, the actual determination of disability is made by an authorized state agency. Likewise, periodic reexaminations are undertaken by the state, and thus it is not until the redetermination hearing stage that the SSA becomes integrally involved in the merits of a given case.

8. It is true, as defendant contends that the SSA redetermination hearing is not undertaken in a vacuum, inasmuch as the Agency has before it affidavits based on personal examination of the applicant undertaken by his own doctor and sometimes by doctors assigned by the Agency.

Nevertheless, as the reversal rates cited below indicate, there is a basis to stress the importance of a face to face hearing.

9. *See* 20 C.F.R. § 404.917.

10. As stressed by the Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), no decision issued by the SSA is ever totally "final" in the sense that the applicant's file is retained in order that new evidence may be submitted, should any become available. Moreover, within 60 days after a "final decision" of the Secretary the applicant may obtain a review of the decision in district court. 42 U.S.C. § 405(g).

11. *Committee on Ways and Means, Staff Report on the Disability Insurance Program 1* (July, 1974).

12. Defendant's Memorandum of Jan. 30, 1976, at 27. If measured against all initial denials of

to those individuals who feel sufficiently aggrieved with the Agency's decision to seek an appeal (the relevant class in this case), the prospects for a reversal are substantial. It cannot be persuasively maintained that a pattern of extended delay in the completion of hearings before an administrative law judge is but a matter of small consequence to such aggrieved applicants.

### (b) Causes of the Backlog and Remedial Steps Taken

A number of factors have contributed to the existing backlog of appeals cases before administrative law judges. In the first place, the government represents that a large volume of "black lung" cases have been filed under the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 901 et seq. While special judges have been appointed to hear these cases, appeals have appeared in such volume that the Hearings and Appeals Bureau has been required to shift some Title II (disability) judges to cover them.[13] Similarly, the enactment of Title XVI of the Social Security Act, Supplemental Security Income for the Aged, Blind and Disabled (SSI), has resulted in extra work for Title II judges.[14]

In addition to such external burdens a variety of internal difficulties have plagued the Bureau. Officials complain of inflexibility in the use of Title XVI hearings officers,[15] of difficulties in recruiting a sufficient number of administrative law judges,

and of a growing number of disability appeals.[16]

Steps have been taken both by the SSA and by Congress to reverse the flow of this tide. The Agency has, for instance, substantially increased its support staff, added to the number of administrative judges and hearings officers, and instituted various improved techniques to expedite case processing. Productivity has risen substantially as a result of these and other innovations,[17] although officials point to a deluge of incoming cases which have overwhelmed the improvements in recent months.[18]

Congressional hearings were held in 1975 to probe the backlog problem, and a piece of remedial legislation, P.L. 94–202, was thereafter passed by Congress and signed into law in January of 1976.[19] This bill provides the Secretary of HEW with temporary authority to permit the use of SSI hearing examiners to review Title II appeals. It may be noted that during the time P.L. 94–202 was before Congress additional legislation was introduced which would have set an express time limitation on the scheduling and completion of appeals hearings.[20] In H.R. 5276, introduced by Rep. Seiberling, a 120-day maximum limit would have been imposed.[21] No such time restriction was included in the final legislation, however.

It was originally the aim of the SSA Hearings and Appeals Bureau to reduce the median delay in obtaining a hearing before an administrative law judge to 90 days by

---

disability, the relevant error rate is approximately 13.5%. If only appeals before the Hearings and Appeals Bureau administrative law judges are considered, the reversal rate becomes a much larger 51.6%.

**13.** Defendant's Memorandum of Jan. 30, 1976, at 11–12 (citing affidavit of Daniel Schultz, Director of Bureau of Hearings and Appeals). The initial number of hearing requests under the Black Lung program was 75,000.

**14.** Id. at 12–13.

**15.** Aff. of Daniel L. Schultz, Jan. 15, 1976, at 5.

**16.** Defendant's Memorandum of Jan. 30, 1976, at 15.

**17.** When measured from the lowest productivity period (the fourth quarter of FY 1974) through the end of the first quarter of FY 1976, there has been a national level productivity increase of 62%. Aff. of Daniel L. Schultz, Jan. 15, 1976, at 8. There has likewise been a marked productivity increase in the Connecticut area. Id.

**18.** See Aff. of Jan J. Sagett, July 15, 1976.

**19.** Defendant's Memorandum of Jan. 30, 1976, at 16.

**20.** Id. at 16–17.

**21.** Id.

July, 1977.[22] Recently the Bureau has abandoned this estimate because of shortfalls in administrative law judge recruitment.[23] Nevertheless it has been shown that productivity gains are possible to achieve, and defendant anticipates the special assignment of two corps of temporary administrative law judges to Region I (which includes Connecticut) to combat the large backlog in this geographical region. It is estimated that through the use of these judges the Region I backlog can be reduced by 40 per cent.[24]

The primary issue to be decided on these facts is whether or not the administrative hearing delays experienced in the SSA appeals system deprive the plaintiff of statutory or constitutional rights or privileges, thereby justifying action by this Court. For reasons stated below, we conclude that they do.

## JURISDICTION AND MOOTNESS

█ Before reaching the merits, the defendant's motion for dismissal based on mootness and lack of jurisdiction must be addressed. The defendant has taken the position from the outset that subject matter jurisdiction was lacking in this Court by virtue of the restrictions set up within the Social Security Act, 42 U.S.C. §§ 405(g) and (h).[25] The plaintiff has responded that the statutory limitation imposed in these sections extends only to suits "brought . . . to recover on [a] claim arising under [the Social Security],[26]" whereas the thrust of plaintiff's present action, they argue, is to expedite disability hearings and not to procure an advance judicial pronouncement on the merits of a particular case.

While the present motions were pending the Supreme Court decided *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In that case, the plaintiff argued, pursuant to *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and related cases, that fifth amendment due process necessitates an evidentiary hearing prior to the termination of disability benefits by the Secretary. The government argued that the Court's interpretation of § 405(h) in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), precluded federal court action, since no "final decision" had been taken by the Agency.[27] The *Eldridge* Court held, however, that a "sufficiently 'final decision'" had in fact occurred, since Eldridge protested the termination of his benefits and the SSA had rejected the protest.[28] Thus, jurisdiction was found under the Social Security Act itself, 42 U.S.C. § 405(g).

Plaintiff in the present action does not allege jurisdiction under § 405(g). The holding in *Eldridge* therefore does not redound directly to his benefit. Neither does it stand as an impassible barrier to the maintenance of his action, as defendant strongly contends. Indeed, the principal jurisdictional questions in this case were expressly reserved by the *Eldridge* Court, when it said:

> "Given our conclusion that jurisdiction in the District Court was proper under § 405(g), we find it unnecessary to consider Eldridge's contention that notwithstanding § 405(h) there was jurisdiction over his claim under the mandamus stat-

22. Statement of Atty. Thomas Stout for defendant to the Court, Feb. 17, 1976.

23. Aff. of Jan J. Sagett, July 15, 1976, at 2.

24. *Id.* at 2–3.

25. 42 U.S.C. § 405(h) reads, in its relevant part: "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."
 In *Weinberger v. Salfi*, 422 U.S. 749, 756–67, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (Rehnquist, J.), the Court presented quite a restric-

tive interpretation of § 405(h) in a case where plaintiff sought § 1331 jurisdiction to attack specified Social Security Act provisions as unconstitutional. *Salfi* involved a substantive attack upon the statute, however, and in this regard is distinguishable from the present case.

26. 42 U.S.C. § 405(h) (last sentence).

27. *See Mathews v. Eldridge, supra,* at 327, 96 S.Ct. 893.

28. *Id.* at 326–332, 96 S.Ct. 893.

ute, 28 U.S.C. § 1361, or the Administrative Procedures Act. 5 U.S.C. § 701 *et seq.*" 424 U.S. at 332 n. 12, 96 S.Ct. at 901.

What is more, in applying statutory prohibitions on judicial review of agency decisions, the *Eldridge* Court stressed the need to weigh the specific prayers and allegations in a plaintiff's action against the language and purpose of the prohibition, placing special emphasis on the need to preserve constitutional claims.[29] The Court in *Eldridge* itself adopted this relational approach, framing the jurisdictional issue as "whether the denial of Eldridge's claim to continued benefits was a sufficiently 'final decision' *with respect to his constitutional claim* to satisfy the statutory exhaustion requirements."[30] It was significant to the Court in analyzing the question that "Eldridge's constitutional challenge is entirely collateral to his substantive claim of entitlement."[31]

Here again the question is not whether there has been a "final decision," but whether statutory and constitutional violations have occurred as the result of a *delay* in final action. Thus plaintiff seeks to avoid § 405(g) rather than to fall under it, arguing that his is not a suit to "recover on any claim arising under" the Social Security Act, but only to have the system operate with reasonable speed. *Eldridge* offers at least tacit support for this approach, and certainly presents no prohibitive impediment to it. We hold, therefore, on an anal-

ysis of *Eldridge* and of the language in 42 U.S.C. § 405(h), that the latter statute does not bar the Court's assuming jurisdiction of this case exclusive of the limitations provided under § 405(g).[32]

It remains to be determined, whether or not sufficient grounds exist for the Court to take up jurisdiction under other statutes, in particular 28 U.S.C. § 1361 (mandamus) and 5 U.S.C. §§ 701, 704 and 706 (Administrative Procedure Act). Since plaintiff's case is strongest for mandamus jurisdiction, and since that would be a sufficient basis for purposes of this litigation, we analyze it first.

■ Several courts have recently upheld mandamus jurisdiction on facts similar to those of the present case. *Blakenship v. Mathews*, No. C 75–0185 L(A) (W.D.Ky. May 6, 1976); *Sturgill v. Mathews*, No. 75–288 (E.D.Ky. Sept. 17, 1975); *Barnett v. Weinberger*, No. 74–270 (D.Vt. May 6, 1975); *cf. Tatum v. Weinberger*, No. C 74–351 L(A) (W.D.Ky. Jan. 16, 1975), 541 F.2d 161 (6th Cir. 1976). The thrust of these decisions is similar. Mandamus jurisdiction requires that three basic conditions be met: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly denied and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Lovallo v. Froehlke*, 468 F.2d 340, 343 (2d Cir. 1972), *cert. denied*, 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973). Here, as in the cases cited,[33] these conditions are met.

---

**29.** In a footnote, the Court stated:

"Decisions in different contexts have emphasized that the nature of the claim being asserted and the consequences of deferment of judicial review are important factors in determining whether a statutory requirement of finality has been satisfied. The role these factors may play is illustrated by the intensely 'practical' approach which the Court has adopted . . . when applying the finality requirements of 28 U.S.C. § 1291 . . . and 28 U.S.C. § 1257 . . . . *[T]he core principle that statutorily created finality requirements should, if possible, be construed so not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered remains applicable.*" 331 n. 11, 96 S.Ct. at 901 (emphasis added).

**30.** *Id.* at 330, 96 S.Ct. at 900 (emphasis added).

**31.** *Id.*

**32.** *Accord, Sturgill v. Mathews*, Civ. No. 75–288 (E.D.Ky. Sept. 17, 1975). *Cf. So. Windsor Convalescent Home v. Mathews*, 541 F. 910 at 913–914 (2d Cir. 1976); *Lejeune v. Mathews*, 526 F.2d 950, 953 (5th Cir. 1976); *Sanders v. Weinberger*, 522 F.2d 1167, 1171 (7th Cir. 1975).

**33.** The above cited cases are not directly in point, since different Social Security programs or practices were challenged therein. Nevertheless, *Blakenship, Sturgill* and *Barnett* involved substantially the same issue as we find here, and the jurisdictional analyses presented in those cases are clearly germane.

 In the first place plaintiff has a clear right to the hearing he seeks, 42 U.S.C. § 405(b); 20 C.F.R. § 404.917. Secondly, there is a duty upon the Secretary to perform within a reasonable time and not permit unreasonable delay of administrative action. 5 U.S.C. § 555(b).[34] This sort of duty has been held to be mandatory. *Deering Milliken v. Johnston*, 295 F.2d 856, 860–61 (4th Cir. 1961); *see also, Barnett v. Weinberger, supra.* And thirdly, it is the crux of plaintiff's suit that he cannot receive a prompt hearing, a fact, which on its face, the Secretary does not (and indeed could not successfully) dispute. Thus by definition, there is virtually no other adequate remedy available.[35] Nor can it be argued that since the Secretary's duties are to some measure discretionary, mandamus is precluded. When the actions or inactions of an official greatly exceed the discretion vested in the office, mandamus may be appropriate. *Nixon v. Secretary of the Navy*, 422 F.2d 934, 939 (2d Cir. 1970); *United States ex rel. Schonbrun v. Commanding Officer*, 403 F.2d 371, 374 (2d Cir. 1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 660 (1969).

The Court concludes that jurisdiction is proper under 28 U.S.C. § 1361. Having reached this conclusion, it is unnecessary to consider alternative bases of jurisdiction.[36]

 Defendant also has urged the Court to set aside this case as moot, since White,

the named plaintiff, has now received a hearing and a favorable decision from the SSA Appeals Council. The Court does not believe that White's ultimate satisfaction in this matter requires that it dismiss the action. The Supreme Court in *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), a case on which defendant relies heavily, looked to the date of class certification as a key point in time with respect to mootness determination. *Id.* at 397–400, 95 S.Ct. 553. This might admittedly create some problem for plaintiff, since although White's reversal came in December of 1975 —well after the certification of the class in July, 1975—White's hearing before an administrative law judge was held on May 21, 1975, which was well before the certification date. Nevertheless, the Court in *Sosna* expressly recognized that in an appropriate case (*e. g.*, where the case becomes moot with respect to named plaintiffs "before the District Court can reasonably be expected to rule on a certification motion") certification may "relate back" to the date of the filing of the complaint. *Id.* at 402 n. 11, 95 S.Ct. at 559. Here, plaintiff's motion for class certification was filed on March 17, 1975, and a hearing on the motion was held before this Court on May 19, both of which dates precede the earliest point at which the case might have arguably become moot. Under the *Sosna* holding, then, and in light of the fact that "a live controversy" persists to this date and has so persisted throughout

34. "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in any agency proceeding. So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. *With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.* This subsection does not grant or deny a person who is not a

lawyer the right to appear for or represent others before an agency or in an agency proceeding." 5 U.S.C. § 555(b) (emphasis added).

35. Conceivably the Secretary could act on the basis of a complaint addressed to him by an individual aggrieved applicant. But the Secretary is already fully aware of the existing appeals backlog, and it must be concluded that no adequate remedy is available.

36. The Court expresses no opinion as to whether independent jurisdiction might be available under the Administrative Procedures Act. While it was not relied upon by the plaintiff, on the other hand, it would not seem frivolous to this Court for plaintiff to seek jurisdiction under § 405(g), in light of language in the *Eldridge* opinion. *See* note 29 *supra.*

the proceedings,[37] the Court sees no valid reason upon which to declare this case moot.

## SUBSTANTIVE CLAIMS

In a supplemental brief,[38] the defendant urged strongly that the plaintiff's constitutional claims were rendered untenable by the decision in *Eldridge v. Mathews, supra*. In light of defendant's heavy reliance on that case, the Court feels obliged to address the matter briefly.

As stated above, *Eldridge* involved the claim by a terminated disability recipient that the absence of an evidentiary hearing before termination deprived him of due process, as the termination of welfare benefits without a prior hearing was found to violate due process in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Recognizing the validity of *Goldberg*, but refusing to extend its holding to the facts in *Eldridge*, the Court restated the calculus which must be applied, on a case by case basis, when assessing the procedural due process clause:

". . . identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of

such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedure would entail." 424 U.S. at 335, 96 S.Ct. at 903.

In denying Eldridge the same pre-termination hearing afforded in *Goldberg*, the Court distinguished between the necessity for a face to face hearing in either situation,[39] and also between the degree of deprivation likely to be suffered by welfare recipients upon termination of their benefits as compared with Social Security disability recipients.[40] It was concluded that, *with respect to plaintiff's particular claim*, a difference of constitutional significance existed between welfare recipients and Social Security disability beneficiaries.

The Court in *Eldridge* did not rule, however, that termination of a disability recipient's benefits is altogether without constitutional significance; indeed, the very opposite was held.[41] The Court merely determined that the disability recipient's deprivation was not sufficient to compel an elaborate and expensive addition onto the existing system for determining disability.[42] So far as this Court can determine, nothing in

37. "There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this Court reviews the case. . . ." at 402, 95 S.Ct. at 559.

38. Defendant's Memorandum of April 9, 1976.

39. The Court stressed that whereas truthfulness is a frequently material issue in welfare hearings, determinations of disability normally proceed through inspection of medical data which is comparatively objective. *Mathews v. Eldridge, supra*, at 343–345, 96 S.Ct. 893.

40. *Id.* at 339–343, 96 S.Ct. 893. The Court drew only a limited distinction between welfare and Social Security disability recipients with respect to need, sufficient to decide the case in *Eldridge*:

"In view of the torpidity of this administrative review process . . . and the typically modest resources of the family unit of the physically disabled worker, the hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient." At 342, 96 S.Ct. at 906 (footnotes omitted).

41. *Id.* at 332, 96 S.Ct. 893.

42. Plaintiff in *Eldridge* sought to affix a full evidentiary hearing at the outset of the disability termination process. Under the circumstances the Court felt that this particular relief was unwarranted:

"The judicial model of an evidentiary hearing is neither required, nor even the most effective, method of decision making in all circumstances." At 348, 96 S.Ct. at 909.

Thus, the Court upheld the constitutionality of the disability appeals structure in its broad outline.

*Eldridge* precludes a finding in plaintiff's favor on the constitutional claims put forth in this case.

Proceeding to the merits, the Court finds this case differs substantially from the case in *Eldridge.* The nature of the personal interest alleged violated is different to begin with. While Eldridge complained of the SSA's decision to terminate his benefits without a hearing, here the plaintiff seeks to have the appeals process proceed in a more prompt fashion.[43] Furthermore, there is a difference in the relevant likelihood of error. Eldridge never filed for a hearing before an administrative law judge, and thus the relevant error rate to consider in his case, as pointed out by the Court,[44] was the incidence of reversals with respect to *all* disability denials. The class in this case, by comparison, consists only of individuals who have taken an appeal. With respect to this class the relevant error rate is far higher than was the case in *Eldridge,*[45] and indeed exceeds 50 percent. Third, there can be far less objection to the remedy sought here from a public interest standpoint than was true in *Eldridge.* It has been demonstrated that improvements are possible through which the backlog of SSA appeals cases may be reduced. There is undeniably a cost associated with such improvements, and the Court is mindful that setbacks may occur despite ardent efforts to avoid them. Nevertheless, the question is not whether there shall be costs incurred, but who shall

bear them while the governmental machinery responsible for providing appeals puts itself in order.

When the government does not act with reasonable promptness, those claiming total disability are required to bear an unreasonable delay and suffer unwarranted deprivation of that which is lawfully theirs. The Court finds that the lengthy and persistent delays experienced in the Title II disability appeals system in Connecticut averaging 211.8 days between January 1973 and March 1975 (moreover, the intervenor Alice Lockwood was required to wait 376 days for a decision) are unreasonable.[46] Such delay denies due process rights to aggrieved applicants and conflicts with the statutory purposes and provisions of the Social Security and Administrative Procedure Acts. These acts require that the Agency act with reasonable dispatch.

Accordingly within the District of Connecticut the defendant shall, on or before July 1, 1977, have reduced the maximum delay between the filing of a petition for a hearing before an administrative law judge and the issuance of a final decision to one hundred and eighty (180) days; and furthermore, by the final day of December, 1977, the Secretary shall have reduced the maximum delay to one hundred and fifty (150) days; and finally, by July 1, 1978, the maximum delay shall be one hundred and twenty (120) days. Failing this, any appli-

**43.** In *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975), the Court stated that

"the possible length of wrongful deprivation of . . . benefits [also] is an important factor in assessing the impact of official action on private interests."

**44.** *Mathews v. Eldridge, supra,* 424 U.S. at 346–347, 96 S.Ct. 893 and n. 29.

**45.** The Court said in *Eldridge* that

"[b]are statistics rarely provide a satisfactory measure of the fairness of a decision making process." At 346, 96 S.Ct. at 908.

In the context of *Eldridge,* which involved a qualitative comparison between hearings and administrative determination, this comment had obvious relevance. Here, reversal statistics are probative of a narrower question—*i.e.,* whether the delay experienced by plaintiff is

associated with a material deprivation, in light of the reversal rate—and thus the use of statistics in this instance is not subject to the same objections as in *Eldridge.*

**46.** While the period between the filing of a petition for a hearing before an administrative law judge and the issuance of a final decision has been the focus of this analysis, it should not be overlooked that the period of time which ensues between the *termination of benefits* and their reinstatement in the event of a favorable appeals result is even longer. In the case of plaintiff White, there was a six month interim between the termination of his benefits and the filing of a petition for appeal after final agency action. This period was not included when computing the original 306 day delay, and thus the latter figure—large as it is—does not fully convey the deprivation which occurred.

cant who, on any of these days, has an application for a hearing which has been pending longer than the allotted time, shall be entitled to receive benefits as though favorable action had been taken in his or her case, subject to termination upon a subsequent unfavorable hearing result. Excludable from the foregoing time limitation shall be such periods of delay as are caused directly by a petitioner's own failure to provide essential information for adjudication. The parties will submit within fifteen (15) days a suitable proposed order to accomplish the purposes of this judgment.

SO ORDERED.