Joseph WILKINSON et al.,
Plaintiffs-Appellants,

v.

Maurice ABRAMS et al.,
Defendants-Appellees.

No. 79–2346.

United States Court of Appeals,
Third Circuit.

Argued March 18, 1980.

Decided July 1, 1980.

*New York Times* privilege to insure that discussion be robust and uninhibited.

Alan L. Phillips (argued), Harold I. Goodman, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs-appellants.

Peter F. Vaira, U.S. Atty., by Walter S. Batty, Jr., Asst. U.S. Atty., Thea Duell (ar-

gued), Philadelphia, Pa., for defendants-appellees.

Before ALDISERT and GIBBONS, Circuit Judges, and GERRY,* District Judge.

## OPINION OF THE COURT

GERRY, District Judge.

This is an appeal from the order of the district court which granted the United States Secretary of Labor's motion for summary judgment and denied the cross-motion of the plaintiff class for summary judgment. This court has subject matter jurisdiction of the claims of the plaintiff class against the Secretary of Labor pursuant to 28 U.S.C. § 1331.[1]

At issue on this appeal is the validity of a regulation promulgated by the Secretary of Labor ("Secretary") concerning the administrative appeal procedures utilized by state governments in state unemployment compensation programs which receive federal financial assistance. The appellants consist of a class of all persons ("*Wilkinson* class") who have filed or will file appeals to the Pennsylvania Unemployment Compensation Board of Review ("Board of Review") from referee decisions denying them unemployment compensation benefits and who will wait in excess of 60 days from the initiation of their appeal until a final decision of the Board of Review.[2] They challenge a regulation of the Secretary which states that such second level appeals within state unemployment compensation programs must

---

* John F. Gerry, United States District Court for the District of New Jersey, sitting by designation.

1. Although plaintiffs alleged as additional bases of subject matter jurisdiction 28 U.S.C. §§ 1337 and 1361, we do not address the propriety of invoking jurisdiction under these additional statutory sections.

2. On November 9, 1976, the district court certified this case as a class action consisting of all members of the following four subclasses:

(1) all persons who have filed or who will file an appeal to the Unemployment Compensation Board of Review from a referee decision denying them unemployment compensation benefits pursuant to an intrastate claim, and who have waited or who will wait in excess of sixty (60) days from the filing of their notice of appeal for a decision to be issued by the Board of Review (exclusive of any time consumed by any request(s) for continuance(s); (2) all persons who have waited or who will wait in excess of fourteen (14) additional days for a reconsideration decision; (3) all persons who have waited or who will wait in excess of thirty (30) days for a final decision by the Board following a decision to remand to a referee for the taking of additional testimony; and (4) all persons who have waited or who will wait in excess of fourteen (14) days following a final favorable Board decision to receive their benefits.

Only those plaintiffs who are members of the first subclass are before this court on appeal. Brief for Appellants at 4.

be decided "with the greatest promptness that is administratively feasible." 20 C.F.R. § 650.3(a). The *Wilkinson* class contends that this regulation condones or fosters undue delays in the processing and decision of second level administrative appeals in state unemployment compensation programs. Plaintiffs raise three basic arguments: (1) that the regulation promulgated by the Secretary is invalid because it lacks a rational basis and because it fails to comport with the purpose of the Social Security Act, 42 U.S.C. § 501–504, insofar as that Act applies to state unemployment compensation programs; (2) that the Secretary is obligated by § 303 of the Act, 42 U.S.C. § 503, to promulgate regulations establishing specific timeliness criteria for the prompt processing of second level unemployment compensation appeals; and (3) that the Secretary's current regulation, and his failure to promulgate a more definite regulation, has deprived the *Wilkinson* class members of due process rights guaranteed by the fifth amendment. The Secretary argues that this case is moot because there are no longer any delays in the processing of second level appeals in Pennsylvania. Alternatively, the Secretary argues in favor of the validity of his current regulation.

We conclude that this case is not moot. Our review of the Secretary's current regulation convinces us that it is rationally founded and consistent with the purposes of the Social Security Act. Moreover, the regulation is not infirm under the Due Process clause. In our view, neither the Social Security Act nor the Due Process clause requires the Secretary to promulgate the more specific regulations urged upon us by the appellants. We will therefore affirm the order of the district court which granted the Secretary's motion for summary judgment and denied the cross-motion by the *Wilkinson* class for summary judgment.

## I.

A. The Social Security Act ("Act") establishes a federal program designed to assist states in the administration of their unemployment compensation programs. Under the Act, 42 U.S.C. §§ 501–504, states whose programs satisfy certain requirements set forth in the Act qualify for federal funding. These funds are used to pay the costs of administering the state's unemployment compensation program. *Id.* § 502. The Secretary of Labor is responsible for monitoring funding to the states. No grant may be made to a state for a fiscal year unless the Secretary certifies the amount to be paid. 42 U.S.C. § 502(a). The Secretary may not certify payment of federal funds unless he first determines that the state's program conforms to federal requirements. In particular, § 303(a) of the Act, 42 U.S.C. § 503(a), requires that the state provide certain procedural safeguards for individuals submitting claims for benefits under the state's unemployment compensation program. That section provides in pertinent part:

(a) The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for—

(1) Such methods of administration . . . as are found by the Secretary of Labor to be reasonable calculated to insure full payment of unemployment compensation when due; and

\* \* \* \* \* \*

(3) Opportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied . . . . .

42 U.S.C. § 503(a)(1), (3). The Secretary is required to stop certifying payments if he finds that the state in administering its program fails to "comply substantially" with these procedural requirements. 42 U.S.C. § 503(b)(2). No further certification of payments may be made until the Secretary is satisfied that the failure has been corrected. *Id.* § 503(b).

Pennsylvania, which receives federal funding for its unemployment compensation program pursuant to the Act, provides two levels of administrative review for individuals whose claims for unemployment

compensation are denied. Pa.Stat.Ann. tit. 43, §§ 751 *et seq.* After an initial determination denying benefits is made by the Department of Labor and Industry of the Commonwealth of Pennsylvania ("Department") on the basis of submitted written information, *id.* § 821, an unsuccessful claimant may appeal this determination to a referee of the Board of Review. At this stage, known as a first level appeal, the claimant is given an "opportunity for a fair hearing," *id.* § 822, which includes an evidentiary hearing with the rights to be present with counsel, to present evidence, and to cross-examine witnesses. 34 Pa. Code § 101.86. The referee, in a written decision, will then affirm, modify or reverse the Department's fact findings and determination. Pa.Stat.Ann. tit. 43, § 822. Although further administrative review is not required as a prerequisite to federal funding under § 303 of the Act, 42 U.S.C. § 503, Pennsylvania, as is the case with many states, provides for a second level appeal from the referee's decision directly to the Board of Review.[3] The Board of Review may affirm, modify or reverse the decision of the referee, either on the basis of the record below or after taking additional evidence. Pa.Stat.Ann. tit. 43, § 824. An aggrieved claimant may then seek judicial review in the Commonwealth Court of Pennsylvania. 42 Pa.Cons.Stat.Ann. §§ 763, 5105(a)(2); 34 Pa.Code §§ 90, 101.-111, 101.112. Any determination of the Department, referee, or Board of Review from which an appeal is not taken becomes the final administrative determination. Pa. Stat.Ann. tit. 43, § 829.

The regulation under attack here is one of several dealing with the promptness with which states must complete their administrative review of claims for unemployment compensation benefits to comply with the procedural safeguards required by § 303 of the Act, 42 U.S.C. § 503. 20 C.F.R. §§ 650.1–650.5. These regulations state that the Secretary interprets §§ 303(a)(1) and (a)(3) to require, as a condition of funding, that a state establish provisions mandating the issuance of decisions in administrative appeals affecting benefit rights with the "greatest promptness that is administratively feasible." 20 C.F.R. § 650.1(b).[4] The regulations further state that the Secretary's interpretation applies to both first and second level administrative appeals. 20 C.F.R. § 650.1(d). Thus, the regulations require that second appeals be decided with the "greatest promptness that is administratively feasible." With respect to first level appeals, the Secretary has provided specific guidelines concerning state compliance with the Secretary's requirements. *Id.* § 650.4(b). The regulations do not establish specific percentage criteria for second level appeals.

B. This appeal arises out of two companion suits filed as class actions in the Eastern District of Pennsylvania, each seeking declaratory and injunctive relief against those officials of the Commonwealth of Pennsylvania ("Commonwealth defendants") and the United States Department of Labor (referred to variously as "federal defendants" or "Secretary") who are involved in the administration of Pennsylvania's unemployment compensation program. *Hower v.*

3. According to the federal defendants, at the present time only three states, Hawaii, Nebraska and New Hampshire, do not provide for second level administrative appeals in their unemployment compensation programs. One state, Ohio, has adopted a second level appeal system whereby a claimant may be denied access to a second level hearing without receiving any reason for the rejection. Affidavit of Robert B. Edwards, February 6, 1979, ¶ 9.

4. More specifically, 20 C.F.R. § 650.3 provides:
   (a) The Secretary interprets sections 303(a)(1) and 303(a)(3) above to require that a State law include provision for—

(1) Hearing and decision for claimants who are parties to an appeal from a benefit determination to an administrative tribunal with the greatest promptness that is administratively feasible, and
   (2) Such methods of administration of the appeals process as will reasonably assure hearing and decision with the greatest promptness that is administratively feasible.
   (b) The Secretary interprets section 303(b)(2) above to require a State to comply substantially with provisions specified in paragraph (a) of this section.

*Smith*, No. 76–2063 (E.D.Pa., filed July 1, 1976); *Wilkinson v. Abrams*, No. 76–1932 (E.D.Pa., filed June 30, 1976). *Hower* challenged the defendants' administration of Pennsylvania's first level unemployment compensation appeals before the referee. *Wilkinson*, from which this appeal is taken, attacked the defendants' administration of Pennsylvania's second level appeals before the Board of Review. Specifically, these two cases challenged the failure of the Commonwealth defendants to render prompt decisions at both the first and second levels of administrative review and the failure of the Secretary to promulgate regulations which would adequately insure that the Commonwealth defendants promptly processed appeals at both levels. The *Hower* class complained that the Secretary's current regulations relating to first level appeals were ineffective because they did not require one hundred percent compliance within any particular period of time. The *Wilkinson* class contended that insofar as the regulations related to second level appeals, they were insufficient because they provided no specific percentage guidelines at all. Both the *Hower* and *Wilkinson* classes challenged the actions of the Commonwealth and federal defendants on statutory and constitutional grounds.

The claims against the Commonwealth defendants in both cases have been settled as a result of stipulations of dismissal entered into between the Commonwealth defendants and the *Hower* and *Wilkinson* plaintiffs. These stipulations, which were approved by the district court and adopted as court orders on April 25, 1977, provided specific timetables for rendering decisions in first and second level appeals. The stipulations further provided that once these timetables were complied with for six consecutive months, the stipulations would expire. Until such time, the court would retain jurisdiction over the actions between the stipulating parties.

By February, 1978, the Commonwealth defendants had achieved compliance with the terms of the *Hower* stipulation.[5] On August 7, 1978, the district court granted a motion by the Commonwealth defendants, in which the *Hower* plaintiffs had joined, to recognize the expiration of the *Hower* stipulation. Because the stipulated schedule for processing second level appeals was found to be unrealistically optimistic, the stipulation in the *Wilkinson* case was amended in February, 1979 ("Amended Stipulation"). The Amended Stipulation altered the original timetable to require that the Board of Review decide sixty-five percent of all second level appeals within seventy-five days.[6] By May 1, 1979, the Commonwealth defendants had been in compliance with the terms of the Amended Stipulation for eight months, and the *Wilkinson* plaintiffs, together with the Commonwealth defendants, filed a joint motion to recognize the expiration of the Amended Stipulation.[7] This motion was granted, and the action insofar as it sought relief against the Commonwealth defendants was dismissed by the district court on July 6, 1979. As a result, only the federal defendants were left in each action.

**5.** This stipulation required the Commonwealth defendants to issue first level appeal decisions at the rate prescribed by the Secretary's regulation. 20 C.F.R. § 650.4(b). As noted earlier, this regulation requires that 60% of all first level appeals be disposed of within 30 days and 80% within 45 days. We have been informed that in 1977 first level appeals in Pennsylvania were processed at a rate of 66.3% within 30 days and 79.1% within 45 days. In 1978, these figures improved: from January through March, 1978, 72.2% were processed within 30 days and 86.9% within 45 days; from April through June, 1978, 69.7% were processed within 30 days and 86.6% within 45 days. Plaintiffs' Motion for Summary Judgment, Exhibits F, G, H.

**6.** In the original *Wilkinson* Stipulation for Dismissal, the Commonwealth defendants agreed to process 60% of all second level appeals within 60 days. Supp. Appendix, p. 14, ¶ 23(a).

**7.** While in 1977 only 45% of Pennsylvania's second level appeals were processed within 75 days, this rate improved during the following year. From September, 1978 through April 1979, 69.3% of second level appeals were processed within 75 days. Plaintiffs' Motion for Summary Judgment, Exhibit F; Joint Motion to Recognize the Expiration of the Amended Stipulation.

On the same day, the district court granted pending summary judgment motions filed by the federal defendants in both cases; cross-motions by the *Hower* and *Wilkinson* plaintiffs for summary judgment were denied, and the two actions were dismissed. In granting the federal defendants' motions, the district court upheld the validity of the Secretary's existing regulations governing first and second level administrative appeals. This appeal was taken by the *Wilkinson* plaintiffs from the district court's ruling insofar as it upheld the validity of the Secretary's regulation concerning second level appeals. The *Hower* plaintiffs, whose claims related to first level appeals, have not appealed from the district court's order. We are thus called upon to review only the Secretary's regulation governing second level appeals.

## II.

■ The Secretary argues that this case is moot because the Amended Stipulation entered into between the *Wilkinson* class and the Commonwealth defendants has had the consequence of eliminating delays in the processing of second level appeals taken to the Board of Review. Although the

Amended Stipulation expired according to its terms, and the case against the Commonwealth defendants was dismissed on July 6, 1979, the Board of Review has since that time voluntarily complied with the time specifications for processing second level appeals set forth in the Amended Stipulation. Despite this commendable behavior by the Board of Review, this appeal from the order terminating the litigation between the *Wilkinson* class and the Secretary is not moot.[8]

■ Mootness doctrine is predicated upon the proper function of the judiciary in deciding cases brought before it. In *California v. San Pablo & T. R. R.*, 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893), the Supreme Court explained:

> The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or

**8.** The Secretary does not contend that this case is moot because the named representatives of the *Wilkinson* class have by now all received their second level decisions from the Board of Review. *See Indiana Employment Security Division v. Burney*, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). Although the record does not reveal whether or not this has occurred, termination of the class representatives'.claims would not render this case moot. Some, if not all, of the named appellants who were certified as class representatives had a case or controversy at the time the complaint was filed and at the time the class action was certified by the district court; there remains in our view a continuing live controversy between the federal defendants and clearly identifiable class members, *i. e.*, those individuals who, notwithstanding the Commonwealth defendants' improved performance, *see* n. 9, *infra*, continue to wait over sixty days for Board of Review decisions. *See United States Parole Commission v. Geraghty*, 445 U.S. 388, 393–399, 100 S.Ct. 1202, 1207–1209, 63 L.Ed.2d 479 (1980); *Bell v. Wolfish*, 441 U.S. 520, 526 n. 5, 99 S.Ct. 1861, 1867, 60 L.Ed.2d 447 (1979); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–60, 47 L.Ed.2d 444 (1976);

*Sosna v. Iowa*, 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1973). In addition, because of the passage of time, it is probable that no single class member's appeal will remain undecided long enough to see the litigation to its conclusion; the issues here are thus, as in *Sosna v. Iowa*, 419 U.S. at 400–401, 95 S.Ct. at 558, and *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975), "capable of repetition, yet evading review." *See also, United States Parole Commission v. Geraghty*, 445 U.S. at 398, 100 S.Ct. at 1209; *Bell v. Wolfish*, 441 U.S. at 526 n. 5, 99 S.Ct. at 1867. Finally, the identity of the *Wilkinson* class members' interests, as well as the tenacity and competence of the attorneys in representing these interests is unquestioned and has been evident through this litigation. *See Franks v. Bowman Transportation Co.*, 424 U.S. at 756, 96 S.Ct. at 1260; *Gerstein v. Pugh*, 420 U.S. at 110, n. 11, 95 S.Ct. at 861; *Sosna v. Iowa*, 419 U.S. at 403, 95 S.Ct. at 559; *Geraghty v. United States Parole Commission*, 579 F.2d 238, 248–49 (3d Cir. 1978), *vacated and remanded on other grounds*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). Compare *Kremens v. Bartley*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977).

abstract propositions, or to declare, for the government of future cases, principles of rules of law which cannot affect the result as to the thing in issue in the case before it.

"The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the action is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975), quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974).

■■■ Mootness doctrine is, in part at least, a function of the article III requirement of a "case or controversy." *See, e. g., North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971); *Powell v. McCormack*, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). This requirement "limit[s] the business of the federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). *See also United States Parole Commission v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 754–55, 96 S.Ct. 1251, 1259, 47 L.Ed.2d 444 (1976). Moreover, mootness doctrine may properly incorporate considerations of policy. *See Kremens v. Bartley*, 431 U.S. 119, 127–32, 97 S.Ct. 1709, 1714–16, 52 L.Ed.2d 184 (1977); *Franks v. Bowman Transportation Co.*, 424 U.S. at 755–57 and n. 8, 96 S.Ct. at 1259–1260. As the court stated in *Geraghty v. United States Parole Commission*, 579 F.2d 238, 246

(3d Cir. 1978), *vacated on other grounds*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), once the article III requirements have been satisfied, the court, in applying the mootness doctrine, "must answer the more policy-oriented question whether the parties before it have, at the time for decision sufficient functional adversity to sharpen the issues for judicial resolution." *See Dow Chemical Co. v. E.P.A.*, 605 F.2d 673, 677–78 (3d Cir. 1979). In this case, neither article III nor policy considerations preclude our review at this time.

Although the Commonwealth defendants have eliminated administrative delays in the processing of second level appeals to the extent reflected in the Amended Stipulation,[9] the Commonwealth defendants' compliance with the terms of the Amended Stipulation is voluntary. Thus the *Wilkinson* class has yet to obtain the relief that it consistently has sought: the promulgation of regulations that would assure the timely disposition of all second level appeals.[10] The Secretary's assertion that such regulations are not now necessary assumes away the purpose of this litigation. Since we cannot say with assurance that there is no likelihood that the Commonwealth defendants will revert to their dilatory behavior, any requirement that the Secretary promulgate such regulations as are sought by the *Wilkinson* class will have a real prospective effect on the processing of second level appeals by the Board of Review. This prospective effect satisfies the article III "case or controversy" requirement. *See Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 514–16, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

---

**9.** Indeed, it appears that the Board of Review has actually improved upon the time limits contained in the Amended Stipulation. The Amended Stipulation required that the Board of Review decide 65% of all second level appeals within 75 days. When the Amended Stipulation expired, 69.3% of second level appeals were being decided within 75 days. *See* n. 6. At oral argument, counsel informed the court that in May, 1979, 87% of second level appeals were decided within 75 days, and that in December, 1979, this rate had tapered slightly to 85% within 75 days.

**10.** We have not been informed that any legislative changes have been made in the structure or procedures of Pennsylvania's system of administrative review designed to assure the continued prompt disposition of second level appeals. *Compare Fusari v. Steinberg*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (change in underlying state statute). Like the law, then, the temporal disposition of the Board of Review may be subject to "ebb and flow." *See* B. Cardozo, *Selected Writings of Benjamin Nathan Cardozo* 369 (1947).

Even assuming that there is no reasonable likelihood of a recurrence of the delays in processing second level appeals which prompted this litigation, this case still is not moot because the relief which the *Wilkinson* class obtained from the Commonwealth defendants pursuant to the Amended Stipulation is not entirely congruent with the relief which it seeks from the Secretary. *See Powell v. McCormack*, 395 U.S. at 495–500, 89 S.Ct. at 1950–1952 (although primary relief sought no longer possible, collateral consequences of litigation prevent case from becoming moot); *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 202–203, 89 S.Ct. 361, 363–364, 21 L.Ed.2d 344 (1968) (dissolution of defendant association did not render antitrust action moot where injunctive relief was also sought against association's members).

The *Wilkinson* class obtained from the Commonwealth defendants, under the terms of the Amended Stipulation initially and through voluntary compliance thereafter, an agreement to process second level appeals at a designated rate. What the *Wilkinson* class seeks in its litigation with the Secretary is a construction of the Social Security Act or the Constitution which would require the Secretary to promulgate regulations imposing a precise timetable for the disposition of second level appeals. Although such relief may well have the effect of compelling the Commonwealth defendants to behave as they have under the Amended Stipulation, it would have other effects as well. If the Secretary's current regulation were invalidated on statutory or constitutional grounds and the Secretary were directed to promulgate new regulations along the lines of those sought by the *Wilkinson* class, it might well be that the Secretary would promulgate regulations having an effect on the Board of Review

different than that of the Amended Stipulation. For example, the Secretary could promulgate regulations establishing a more stringent timetable than the Amended Stipulation, or he could establish regulations that would provide an ongoing incentive for Pennsylvania to restructure its Board of Review's procedures or improve the Board of Review's disposition rate over time. Moreover, the required promulgation of regulations of the type sought by the *Wilkinson* class may well have the effect of creating new legal rights in applicants for unemployment compensation benefits.[11] While the Amended Stipulation between the *Wilkinson* class and the Commonwealth defendants created no rights, duties, or liabilities with respect to the Secretary, regulations promulgated by the Secretary are more likely to be construed as having such an effect. We, of course, decide none of these issues at this time; we merely point out that the relief sought against the Secretary is distinguishable from that obtained from the Commonwealth defendants pursuant to the Amended Stipulation. As a consequence, this case continues as a live controversy. We, therefore, turn to the merits of this appeal.[12]

### III.

The *Wilkinson* class challenges on statutory grounds the validity of the Secretary's current regulation which requires that second level appeals be decided "with the greatest promptness that is administratively feasible." 20 C.F.R. § 650.3(a)(1)–(2). According to their argument, the Secretary's regulation is "not reasonably related to the mandate of the 'when due' clause of 42 U.S.C. § 503(a)(1)," and the Secretary's failure "to issue percentage criteria for second level appeals frustrates the purpose of the statute." Brief for Appellants at 13.

11. *See generally* Note, Violations by Agencies of their own Regulations, 87 Harv.L.Rev. 629 (1974).

12. The Secretary does not argue that the Commonwealth defendants' compliance with the Amended Stipulation has so altered the status of the *Wilkinson* class as to render their dispute unfocussed, thereby precluding our review on policy considerations. *See Kremens v. Bartley*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977). The Amended Stipulation has not altered the identity of the *Wilkinson* class nor the continued interest of class members in obtaining speedy dispositions of second level appeals.

We understand this general argument to consist of three interrelated contentions. First, the current regulation is not permissible under the statutory authority conferred upon the Secretary. Second, the current regulation fails to satisfy the basic administrative rationality requirement; it is, in the familiar words of the Administrative Procedure Act, "arbitrary," "capricious," and "an abuse of discretion." Third, the Secretary is required by § 303(a)(1) of the Act, 42 U.S.C. § 503(a)(1), to promulgate regulations setting forth specific percentage timeliness criteria for second level appeals. After discussing the standard of review of the Secretary's regulations applicable in this case, we will address these contentions *seriatim.*

A.

We must review the Secretary's current regulation to determine whether it is "reasonabl[y] related to the purposes of the enabling legislation." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). We also are to be guided by the judicial review provisions of the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706.[13] There is no conflict, however, between these standards and the scope of review described in *Mourning v. Family Publications Service, Inc.,* 411 U.S. at 369, 93 S.Ct. at 1660, since regulations not reasonably related to the purposes of the enabling legislation would not survive scrutiny under the APA.

With respect to judicial review of agency rule-making, section 10(e) of the APA provides in pertinent part that:

The reviewing court shall—

.    .    .    .    .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.    .    .    .    .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right  .   .   .

5 U.S.C. § 706.

In applying these review standards, the Secretary's construction of section 303 of the Act, 42 U.S.C. § 503, as reflected in his regulations, is entitled to presumptive validity. Unless "the clear meaning of a statute, as revealed by its language, purpose and history," *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979), otherwise constrains us, we must show "great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the [agency's] application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'" *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

B.

The *Wilkinson* class challenges the regulation promulgated by the Secretary as being "short of statutory right." 5 U.S.C. § 706(2)(C). It posits, correctly, that under 42 U.S.C. § 503(a)(1), administrative appellate review of denials of eligibility for unemployment compensation must be "reasonably calculated to ensure full payment when due." It then contends that the Secretary's regulation, requiring decisions with "the greatest promptness that is adminis-

---

**13.** Courts reviewing the regulations of other agencies promulgated pursuant to the same statutory authority under which the Secretary acted in this case, 42 U.S.C. § 1302, have either applied the APA standards of judicial review set forth in 5 U.S.C. § 706 in conjunction with the "reasonably related" test, *see, e. g., State of*

*Florida v. Mathews,* 526 F.2d 319 (5th Cir. 1976), or have applied this latter test alone. *See, e. g., National Welfare Rights Organization v. Mathews,* 533 F.2d 637 (D.C.Cir.1976); *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841 (5th Cir. 1974).

tratively feasible," 20 C.F.R. § 650.3(a), is not "reasonably calculated." Our evaluation of whether the Secretary, in promulgating this regulation, acted consistently with his statutory authority "begins with a delineation of the scope of the Secretary's authority and discretion." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ The statutory authority for promulgating the regulations at issue here is quite broad. The Act imposes a duty on the Secretary to monitor regularly the administrative review procedures provided by state unemployment compensation programs. Annual federal funding is to be approved only for those programs which, in the Secretary's judgment, have procedures "reasonably calculated to ensure full payment of unemployment compensation when due" and provide unsuccessful claimants with an "opportunity for a fair hearing, before an impartial tribunal." 42 U.S.C. § 503(a)(1), (3). At the same time, the Secretary is given a great deal of flexibility in determining whether a state's program satisfies the statutory prerequisites to funding, since he need only satisfy himself that a program "complies substantially" with these prerequisites. *Id.* § 503(b)(2). To enable him to carry out this duty, the Social Security Act provides that the Secretary "shall make and publish such rules and regulations, not inconsistent with [the Act], as may be necessary to the efficient administration of the functions with which [the Secretary] is charged under [the Act]." 42 U.S.C. § 1302. Thus, in carrying out the mandates of the Act, the Secretary is vested with plenary rule-making authority. *See Serritella v. Engleman*, 339 F.Supp. 738, 752 (D.N.J.), *aff'd per curiam*, 462 F.2d 601 (3d Cir. 1972).

In exercising his broad authority, the Secretary must be cognizant that "[t]he basic thrust of the statutory 'when due' requirement is timeliness." *Fusari v. Steinberg*, 419 U.S. 379, 387–88, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975), citing *California Human Resources Dept. v. Java*, 402 U.S. 121, 130–

33, 91 S.Ct. 1347, 1353–1354, 28 L.Ed.2d 666 (1971). In *Java*, the Supreme Court described the intent of Congress in enacting this legislation as follows:

The objective of Congress was to provide a substitute for wages lost during a period of unemployment not the fault of the employee. Probably no program could be devised to make insurance payments available precisely on the nearest payday following the termination, but to the extent that this was administratively feasible this must be regarded as what Congress was trying to accomplish.

402 U.S. at 130, 91 S.Ct. at 1353. Construing the intended meaning of the "when due" clause to be full payment "at the earliest stage of unemployment that such payments [are] administratively feasible after giving both the worker and the employer an opportunity to be heard," *id.* at 131, 91 S.Ct. at 1354, the Court held that California's unemployment compensation program could not consistently with the "when due" requirement withhold payment of unemployment compensation from a claimant pending any employer's appeal from an initial determination of eligibility. The Court identified several reasons underlying the requirements of rapid payment: (1) "to give prompt if only partial replacement of wages to the unemployed, to enable workers to tide themselves over, until they get back to their old work or find other employment, without having to resort to relief," *id.* at 131, 91 S.Ct. at 1354 (footnote omitted); (2) to provide "a means of assisting a worker to find substantially equivalent employment," *id.* at 132, 91 S.Ct. at 1354; and (3) to provide a means of exerting an influence upon the stabilization of industry by preventing "a decline in the purchasing power of the unemployed, which in turn serves to aid industries producing goods and services." *Id.* In *Fusari v. Steinberg*, 419 U.S. at 388–89 and n. 15, 95 S.Ct. at 539, the Court, to achieve these statutory purposes, suggested that the rationale of *Java* should extend to require prompt disposition of claims submitted for determination to the administrative process. The requirement of timeliness is applicable at all phases of the

administrative process: not only to the time within which claimants determined to be eligible are paid, but also to the rapidity with which appeals of ineligibility determination are decided, lest claimants who ultimately win their appeals suffer long delays in obtaining payment. *See Ross v. Horn*, 598 F.2d 1312, 1321 (3d Cir. 1979),[14] *cert. denied*, —— U.S. ——, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980).

Since the Secretary is obligated to approve federal funding only for state programs with procedures "reasonably calculated to ensure full payment of unemployment compensation when due," we must measure the Secretary's regulation against this statutory mandate. The challenged regulation requires the disposition of appeals with the "greatest promptness that is administratively feasible." Because the statutory phrase "when due" is textually open-ended, it is somewhat difficult to measure against the Secretary's standard of administrative feasibility. We are satisfied, however, that the standard chosen by the Secretary is consistent with the right created by the statute. In *Java*, the Supreme Court stated that " 'when due' was intended to mean at the earliest stage of employment that [unemployment compensation] payments were *administratively feasible* . . . ." 402 U.S. at 131, 91 S.Ct. at 1354 (emphasis added). The Supreme Court's construction of the statute is thus reflected directly in the language of the Secretary's regulation. The purpose of the statute is to assure federal funding only for state unemployment compensation programs in which benefit claims receive prompt and accurate disposition. These statutory goals of promptness and accuracy find support in the Secretary's standard of administrative

---

14. We find no merit in the Secretary's argument that the "when due" requirement of § 303(a)(1) of the Act, 42 U.S.C. § 503(a)(1) does not apply until a claimant has first been administratively determined to be eligible for unemployment compensation benefits. The Supreme Court in *Fusari v. Steinberg*, 419 U.S. 379, 388–89, n. 15, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975), made clear that it would not endorse such a restrictive interpretation of the statute. Plaintiffs in *Fusari* had challenged the legality of Connecticut's unemployment compensation procedures for determining continued eligibility for benefits, asserting that the suspension of benefits without an adequate prior hearing violated the "when due" requirement of § 303(a)(1). The district court expressed serious reservations whether Connecticut's system satisfied this requirement, stating that: "[I]f the purpose of unemployment compensation really is 'salary replacement' and providing benefits to the worker as close to the date of unemployment as possible, it would seem that a system that makes large numbers of those with valid claims wait on the average of over 100 days before allowing them benefits conflicts seriously with the statutory objectives." 364 F.Supp. 922, 937 (D.Conn.1973) (citation omitted). However, the district court felt foreclosed from finding a statutory violation, believing itself bound by the Supreme Court's summary affirmance in *Torres v. New York State Dept. of Labor*, 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), of a three-judge court decision upholding the validity of New York's system of terminating unemployment compensation benefits without a prior hearing against a similar § 303(a)(1) attack. In reaching its conclusion, the three-judge court interpreted § 303(a)(1) to mean that once an administrative determination of ineligibility was rendered, payments were no longer "due." The Supreme Court in *Fusari* explained that the district court had misunderstood the significance of the summary affirmance in *Torres*:

> The District Court interpreted our summary affirmance in *Torres* to indicate that benefits are not "due" under § 303 until administratively deemed payable. While this is a plausible reading of the evolution and affirmance of *Torres*, it is not one that we can endorse. Such a definition of the "when due" requirement of federal law would leave little vitality to *Java* and would nullify the congressional intention of requiring prompt administrative provision of unemployment benefits.

(Citations omitted.) The Secretary here seeks to skirt the *Fusari* Court's explanation of the *Torres* summary affirmance by distinguishing both *Torres* and *Fusari* on the basis that in those cases the claimant had at least received an initial administrative determination of eligibility for unemployment compensation benefits. The Secretary argues that where a claimant has never been determined eligible, the "when due" requirement is inapplicable. But this conclusion would no less nullify the "vitality" of *Java* than the conclusion of the *Fusari* district court. The congressional intent of requiring prompt payment "when due" applies as much to a claimant who is determined eligible on appeal from an initial determination as one who was found eligible at the initial stage. The critical factor is *timely* payment to *all* eligible persons, whether their eligibility is upheld initially or only after one or more appeals.

feasibility; imposing standards for administrative performance that are not feasible would jeopardize both of these goals. Because the Secretary's regulation tracks the Supreme Court's construction of the statute and is itself consistent with the purposes of the statute, we hold that it is not short of statutory right and that the Secretary did not deviate from his statutory mandate.

### C.

In addition to arguing that the Secretary has failed to discharge his statutory mandate, the *Wilkinson* class contends that the Secretary has acted in a manner which is arbitrary, capricious, and an abuse of discretion in promulgating the current regulation. Specifically, appellants argue that the Secretary cannot rationally distinguish between first and second level appeals; that in light of the specific percentage promptness criteria for first level appeals, the failure to promulgate similar regulations with respect to second level appeals is an abuse of discretion.

The applicable standard of review was described by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971), as follows:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment [citations omitted]. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Under this scope of review, "there will be occasions when 'we must affirm decisions with which we disagree' as long as they are rational and reflect a full consideration of relevant factors." *National Industrial Sand Association v. Marshall,* 601 F.2d 689, 699 (3d Cir. 1979), *quoting Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C.Cir.1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). (Footnote omitted.)

The Secretary has asserted several justifications for promulgating only a general regulation concerning second level appeals. First, the decision to provide second level appeals is discretionary with each state. The Secretary wishes to encourage states to provide second level administrative appeals since this procedure provides a relatively low-cost means for a claimant to challenge an adverse benefit determination after an initial full hearing on the merits of his claim. According to the Secretary, this goal might be jeopardized by regulations governing second level appeals which establish any standard more stringent than that of administrative feasibility. Any state that feels burdened by such stringent regulations could simply do away with second level appeals. The *Wilkinson* class, not surprisingly, disputes the likelihood of such a response on the part of states with second level appeals.

Second, the Secretary states that the variety of second level administrative appeal procedures that exist among states would make it difficult to establish regulations with specific percentage criteria for second level appeals.[15] While the *Wilkinson* class's counterpoint—that the Secretary has overcome such difficulties with respect to the first level appeals—is not without substance, this riposte is not sufficient to render the Secretary's position arbitrary or capricious. The issue here is not whether the Secretary could better draft his regulations, but whether his regulations have a rational basis.

Finally, the Secretary asserts that the practical difference between the current

---

15. We are advised that some states provide merely for a review of the record on the second administrative appeal, while others, as in Pennsylvania, allow additional evidence and/or oral argument. In addition, Ohio provides for a summary rejection of the appeal without stated reasons. Affidavit of Robert B. Edwards, February 6, 1979, ¶¶ 9, 12.

general regulation governing second level appeals and the specific percentage regulation sought by the *Wilkinson* class is negligible. Discontinuation of federal funding to a state program would disadvantage the state certainly, but it would also adversely affect those unemployed persons seeking unemployment compensation benefits. For this reason, the regulations provide that even when a state has failed to comply substantially with the requirements of the statute, the Department of Labor will, before withholding funding, make "every reasonable effort" to "resolve the question involved." 20 C.F.R. § 601.5(a)–(b). Since the regulations are therefore in practice applied more as guidelines than as mandatory standards, it is not unreasonable, according to the Secretary, to frame the regulation at issue in terms of a general precatory standard.

In addition to the foregoing justifications for his current regulation, the Secretary also contends that it is reasonable to distinguish between first and second level appeals, establishing specific percentage criteria for the former but not the latter. First level appeals, in Pennsylvania at least, provide the first opportunity for a full hearing on the disputed benefit claim. It is important that such hearings be provided promptly and that claims be disposed of expeditiously. Moreover, relatively precise regulations are a useful means of guiding administrative discretion at the initial and least formal administrative stages. Since claimants appealing to the second level of administrative review will generally have been previously afforded a full administrative hearing on their claims within specified time limits, the Secretary explains that it is sufficient to require the processing of second level appeals with the promptness that is administratively feasible.

■ After reviewing the justifications provided by the Secretary for his current regulation and the distinction between first and second level appeals, we conclude that the Secretary's regulation is rationally based. The threat of creating a disincentive to the continued maintenance of second level administrative review procedures appears to us to be real. Also, the difficulties in promulgating specific second level appeal regulations because of the differences in administrative procedures among states seem plausible. Finally, since second level appeals take place after the claimant has been provided a full hearing, first level and second level appeals can rationally be distinguished, and the Secretary may within his discretion apply different promptness criteria for each level as he has done here.[16]

### D.

■ We pause briefly to address the argument of the *Wilkinson* class that the statute requires the Secretary to promulgate regulations setting forth specific timeliness criteria for second level appeals. By deciding that the Secretary's current regulation is within his statutory authority and rationally based, we have implicitly rejected the argument that the Secretary must promulgate such specific timeliness regulations. We note, in addition, that nothing in the text of the statute of the legislative history supports the imposition of such a duty on the Secretary. In fact, the argument of the *Wilkinson* class runs contrary to the general rule that the Secretary is accorded broad discretion in promulgating regulations. We expressly reject this argument.[17]

16. The *Wilkinson* class also argues that the Secretary's regulation governing second level appeals is invalid because it is so vague as to provide neither an incentive for states to process their second level appeals in a prompt fashion nor any meaningful basis for the Secretary to carry out his statutory monitoring duty. We disagree. The standard of administrative feasibility is an intelligible one, and puts the states receiving federal funding on notice that slothfulness in the review process will not be tolerated. This standard also has the advantage of enabling the Secretary to monitor state programs on an individualized basis.

17. In assessing the statutory validity of the Secretary's regulation, we have considered the effect of this regulation on the rate of processing of second level appeals by the Pennsylvania Board of Review both prior to and after the date of the Amended Stipulation. The standard set forth in the Secretary's regulation is administrative feasibility. Certainly the im-

## IV.

The *Wilkinson* class challenges the Secretary's regulation on fifth amendment due process grounds. They contend that the current regulation fosters unreasonable delays in the determination of second level appeals and that these delays result in a constitutional deprivation. No attack is made on the Secretary's regulation insofar as it affects the procedures provided by states in the administration of the unemployment compensation programs; the attack is based only on the delays that ensue in the operation of these state administrative procedures.

In evaluating the due process claim raised by the *Wilkinson* class, we must first determine whether the interest asserted is within the fifth amendment's protection of "property." *See Smith v. Organization of Foster Families*, 431 U.S. 816, 838–39, 97 S.Ct. 2094, 2106, 53 L.Ed.2d 14 (1977). Property interests in benefits protected by due process were described by the Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than an unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

. . . Property interests of course are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Once it is determined that a constitutionally protected property interest is implicated by official action, the remaining question is to determine what process is due. This determination is not a mechanical one, for "due process is flexible and calls for such procedural protection as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Three factors are generally considered in delineating the process that is constitutionally due:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). (Citation omitted.)

State statutes providing for the payment of unemployment compensation benefits create in the claimants for those benefits property interests protected by due process. *See Ross v. Horn*, 598 F.2d 1312, 1317–18 (3d Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 3048, 65 L.Ed.2d 1136, (1980).[18]

---

proved rate of processing achieved under the Amended Stipulation has established a benchmark for applying this standard. If the Board of Review were to regress significantly without justification from the rate of processing achieved during the life of the Amended Stipulation, this would most likely violate the Secretary's administrative feasibility standard. Enforcement of the regulation would then be sought in court. We need not decide at this time whether prolonged period of unreasonable delay in the processing of second level appeals might call into question the utility of the administrative feasibility standard itself. *See Blankenship v. Secretary of HEW*, 587 F.2d 329 (6th Cir. 1978); *Caswell v. Califano*, 583 F.2d 9 (1st Cir. 1978); *Barnett v. Califano*, 580 F.2d 28

(2d Cir. 1978); *White v. Mathews*, 559 F.2d 852 (2d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). *But see Wright v. Califano*, 587 F.2d 345 (7th Cir. 1978).

**18.** Our conclusion that claimants for state unemployment compensation benefits have a protected property interest applies no less to claimants, like the *Wilkinson* class, seeking to establish eligibility in the first instance, than to claimants, as in *Ross v. Horn*, 598 F.2d 1312 (3d Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 3048, 65 L.Ed.2d 1136, (1980), seeking to establish continued eligibility. The *Wilkinson* class members claim an entitlement to benefits that is grounded in the statute defining their

No challenge has been raised to the Secretary's regulation insofar as it affects the type or adequacy of procedures that Pennsylvania has provided for raising and disposing of second level appeals. The due process challenge is founded on the contention that the Secretary's regulation has condoned or fostered unreasonable delays in the implementation of Pennsylvania's administrative procedures concerning second level appeals.[19] Temporal due process is at issue.

The factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), must be evaluated with the understanding that the fundamental requirement of procedural due process is an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Adequate procedures alone are not sufficient; delay in administrative review of eligibility for state unemployment compensation benefits is a significant factor in assessing the sufficiency of the process provided.[20] *Fusari v.*

*Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975). *See also Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); *Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587, 591, 46 S.Ct. 408, 409, 70 L.Ed. 747 (1926); *Shands v. Tull*, 602 F.2d 1156, 1159 (3d Cir. 1979); *Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978). Unreasonable delays in rendering decisions from appeals of denials of social security benefits may well give rise to a due process violation. *See e. g., Steinberg v. Fusari*, 364 F.Supp. 922 (D.Conn.1973), *vacated on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521, *rehearing denied*, 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *White v. Mathews*, 434 F.Supp. 1252 (D.Conn.1976), *aff'd* 559 F.2d 852 (2d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). However, in assessing "when due process is no longer due process because past due, the influence of other significant factors is not to be ignored." *Wright v. Califano*, 587 F.2d at 354.

We cannot minimize the significance of the private interest at stake in claims for

eligibility. Although they have not shown that they are, in fact, within the statutory terms of eligibility, the Supreme Court has made clear that due process protection extends to claimants seeking to establish their entitlement to the statutory benefits. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). *Accord, Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978) (court reviewing due process challenge by unsuccessful applicants for old age and survivors benefits under the Social Security Act stated that "denials do not necessarily deserve less due process than terminations"). *Steinberg v. Fusari*, 364 F.Supp. 922, 935 (D.Conn.1973), *vacated on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) *rehearing denied*, 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975) ("It makes little difference . . . that those who fail the 'seated interview' test are not entitled to [unemployment compensation] benefits . . . [t]hat entitlement is precisely what is at issue . . . .").

**19.** The *Wilkinson* class attempts to demonstrate the constitutional infirmity of the Secretary's regulation concerning second level appeals by showing its effect on the administrative process in states other than Pennsylvania. We do not think that the *Wilkinson* class can adequately represent the interests of claimants for unemployment compensation benefits in

states other than Pennsylvania, see Fed.R.Civ. Proc. 23(a); *Scott v. University of Delaware*, 601 F.2d 76 (3d Cir. 1979), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979), and we do not consider their challenge to the Secretary's regulation other than as it affects the administrative procedures in Pennsylvania.

**20.** In *Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 539–40, 42 L.Ed.2d 521 (1975), the Supreme Court stated that:

Identification of the precise dictates of due process requires consideration of both the governmental function involved and the private interests affected by official action. . . . The formality and procedural requisites for a due process hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In this context, the possible length of wrongful deprivation of unemployment benefits is an important factor in assessing the impact of official action on the private interests. Prompt and adequate administrative review provides an opportunity for consideration and correction of errors made in initial eligibility determinations. Thus, the rapidity of administrative review is a significant factor in assessing the sufficiency of the entire process (citations omitted).

unemployment compensation. The importance of unemployment compensation benefits has been recognized by the Department of Labor:

> . . . [U]nemployment insurance is designed to prevent the destitution [occasioned by unemployment] by immediately providing a cash payment to meet the worker's nondeferrable expenses. In this light, there is at least as urgent a need for the prompt processing of unemployment benefits appeals as for those under the Public Assistance Programs.

Promptness Report, Plaintiffs' Motion for Summary Judgment, Exhibit A, p. 12.[21] Since the employed worker generally maintains a household budget premised on the receipt of wage income, sudden unemployment would have a severe effect on this budget. Unemployment compensation payments are designed to smooth the transition between periods of employment by mitigating to a degree the erosion of the household budget caused by temporary unemployment. The congressional decision to provide federal funding for state unemployment compensation programs suggests the importance of this type of social insurance. *See California Human Resources Dept. v. Java*, 402 U.S. at 130, 91 S.Ct. at 1353.

Although the importance to unemployed workers of unemployment compensation benefits cannot be gainsaid, we are required on this appeal only to evaluate the significance of prompt disposition of second level appeals. This interest is of lesser significance than the initial determination of eligibility following an evidentiary hearing. In Pennsylvania, the elemental requirements of due process—notice and an opportunity to be heard—are satisfied during the first level appeal proceeding. First level appeals are the subject of regulations in which the Secretary has established specific percentage timeliness criteria, and neither these regulations nor Pennsylvania's compliance with them is challenged on this appeal. Although the *Wilkinson* class undoubtedly has an interest in avoiding any administrative delay, this interest is attenuated during the second level appeal procedure because the prior denial of benefits has been based on a full hearing presumably provided within the time limits of the Secretary's first level appeals regulations.[22]

We cannot conclude that the risk of erroneous deprivation of unemployment compensation benefits is unnecessarily high in Pennsylvania as a consequence of the regulation promulgated by the Secretary. The erroneous deprivation would presumably occur during the period of alleged unreasonable delay in the decision of a second level appeal which would reverse earlier administrative decisions and uphold a claim for

---

**21.** As a constitutional matter, unemployment insurance is not on the same level with public assistance benefits. *Compare Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (pretermination hearing required for public assistance benefits) *with Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (post-termination hearing permissible for Social Security disability benefits). In *Ross v. Horn*, 598 F.2d 1312, 1318–19 (3d Cir. 1979) *cert. denied*, —— U.S. ——, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), this court upheld the constitutional adequacy of procedures for terminating unemployment compensation benefits in cases of suspected unemployment fraud. We analogized the individual's interest in continued receipt of unemployment compensation benefits to the interest in disability benefits described in *Mathews v. Eldridge, supra*, especially since unemployment compensation benefits are not necessarily need-based.

**22.** Because the private interest implicated in this case concerns only the delay involved in the processing of second level appeals, this case is not analogous to those decisions cited by the *Wilkinson* class which have found due process violations as the result of unreasonable administrative delays in the processing of first level administrative appeals. *See e. g., White v. Mathews*, 434 F.Supp. 1252 (D.Conn.1976), *aff'd* 559 F.2d 852 (2d Cir. 1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *Steinberg v. Fusari*, 364 F.Supp. 922 (D.Conn.1973), *vacated on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975), *rehearing denied*, 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975). First level appeals involve the crucial point at which claimants for unemployment compensation benefits are afforded an evidentiary hearing on their claims. The private interest in this initial procedure is at its apogee. This fact, taken in conjunction with other due process considerations, may well lead to the conclusion that unreasonable delays at this level violate due process.

unemployment benefits. But prior to filing a second level appeal in this case, each member of the *Wilkinson* class would already have received two determinations of ineligibility—an initial denial of eligibility and an affirmance of this denial by a referee of the Board of Review.[23] During the referee review stage, claimants are afforded a hearing, and are permitted to appeal with counsel, to present evidence, and to confront and cross-examine adverse witnesses. Pa.Stat.Ann. tit. 43, § 822; 34 Pa. Code § 101.86; *Paoloco v. Commonwealth of Pa. Unemployment Compensation Board of Review*, 10 Pa.Cmwlth. 214, 309 A.2d 594 (1973). The referee is required to provide a written decision setting forth findings of fact and conclusions of law. Pa.Stat.Ann. tit. 43, § 822; 34 Pa.Code §§ 101.88, .89. This level of review is subject to the Secretary's regulations setting forth specific percentage promptness criteria.

The procedures provided during the first review level tend to minimize the likelihood that erroneous deprivations will occur be-

cause of unreasonable delays during the second level of review. Moreover, it is not evident that the risk of erroneous deprivations would be reduced if the Secretary were to promulgate alternate regulations. Under the current regulations, second level appeals must be disposed of with the promptness that is administratively feasible. If regulations were promulgated setting forth specific promptness criteria for second level appeals, and these criteria were not administratively feasible, the likelihood of erroneous decision would increase. Errors would multiply as the state administrative system strained to comply with inflexible standards. Alternatively, as the Secretary has suggested, states may simply decide not to provide second level appeals if the federal standards with which they must comply are unduly burdensome. Abolition of second level appeals also would increase the risk of erroneous deprivations.

Moreover, the administrative feasibility standard set forth in the current regulations is not a toothless one. The rate of

---

**23.** Although we do not have a complete summary of the statistics concerning overall reversal rates, *i. e.*, the number of reversals after hearing in relation to all denials of benefits, *see Mathews v. Eldridge*, 424 U.S. 319, 346 and n.29, 96 S.Ct. 893, 908, 47 L.Ed.2d 18 (1976); *Mattern v. Mathews*, 582 F.2d 248, 256 n.11 (3d Cir. 1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979); *Fusari v. Steinberg*, 419 U.S. 379, 383 n.6, 95 S.Ct. 533, 536, 42 L.Ed.2d 521 (1975), in Pennsylvania's unemployment compensation review process, the record reveals that appeals to the Board of Review have resulted in a reversal rate of only between 7.5% and 11.1%. Supp.App. Exhibit A, pp. 17–18; App. Exhibit I, p. 40. This statistic is relevant because our primary concern is not with the risk of erroneous deprivation to individuals taking appeals to the Board of Review but rather with the overall fairness of the entire procedural system. *See White v. Mathews*, 559 F.2d 852, 858 n.7 (2d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). This reversal rate is relatively low and reflects the substantial procedural protections that are afforded at the first level of appeal. This is especially true in view of the fact that the reversal rate would presumably be even lower if the number of reversals were expressed as a percentage of all denials of benefits rather than of only those denials appealed to the Board of Review, and in view of the additional fact that those reversals at the

second level which were based on newly introduced evidence would not necessarily be indicative of a prior erroneous determination. *See Wright v. Califano*, 587 F.2d 345, 351 n.7 (7th Cir. 1978). *Compare Mathews v. Eldridge*, 424 U.S. at 346 and n.29, 96 S.Ct. at 908 (58.6% reversal rate of appealed reconsiderations and 3.3% overall reversal rate was relevant to a determination of the reliability of existing pretermination procedures, though not controlling); *White v. Mathews*, 434 F.Supp. 1252, 1261 (D.Conn.1976), *aff'd* 559 F.2d 852, 858 (2d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978) (over 50% reversal rate of denials appealed to first level of administrative review was relevant to district court's determination that delays averaging 7 months in the administrative review process was violative of due process and was relevant to Second Circuit's affirmance on statutory ground); *Wright v. Califano*, 587 F.2d 345 (7th Cir. 1978) (though facts and issues were similar to those in *White v. Mathews, supra*, no due process violation found); *Steinberg v. Fusari*, 364 F.Supp. 922, 936–37 at n.28 (D.Conn.) *vacated on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521, *rehearing denied*, 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975) (reversal rate ranging from 19.4% to 26% of first level appeals of terminations of unemployment compensation benefits was relevant to determination that failure to provide pre-termination hearings violated due process).

processing of second level appeals by the Pennsylvania Board of Review under the terms of the Amended Stipulation for Dismissal provides a clear benchmark as to the rate that is administratively feasible. We are not required at this time to determine whether the rate of processing of second level appeals in the years prior to the Amended Stipulation for Dismissal violated the due process clause, or the Social Security Act or the Secretary's regulations. It is sufficient to state that the rate that has been achieved under the Amended Stipulation is not an unreasonable one.[24] In light of this benchmark, if Pennsylvania's Board of Review were to regress without justification, to its prior rate of decision of second level appeals, a violation of the Secretary's administrative feasibility regulation may result.

The interest of the federal government that would be implicated if the Secretary were required to revise his regulation governing second level appeals does not appear to be insignificant. The administrative or financial burdens imposed on the federal government would result from the development and implementation of promptness standards applicable in Pennsylvania and, presumably, throughout the country. The Secretary has stated that the promulgation and the implementation of a new regulation could be difficult because of the varied manner in which second level appeals are processed in the different states. Furthermore, in Pennsylvania at least, the administration of the Board of Review is funded entirely by the federal government through the Department of Labor. Thus, any additional funds required to achieve compliance with a revised regulation would have to come from the federal government. We cannot say that these administrative and financial burdens would be insubstantial.[25]

24. In *Steinberg v. Fusari*, 364 F.Supp. 922, 934, 936 (D.Conn.1973), *vacated on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521, *rehearing denied*, 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975), the district court found that Connecticut's unemployment compensation system violated due process in part because delays at first level appeals resulted in about 89.9% of all decisions taking over 100 days. Not only are the figures in this case substantially better than in Connecticut, but we are dealing with second level appeals. In Pennsylvania, first level appeals are decided with even greater promptness than second level appeals.

Because of the various ways in which statistics regarding delays in administrative appeals processes have been presented to courts confronted with constitutional challenges to these processes, it is difficult to make any meaningful comparison between the facts of these cases. For example, the district court in *Torres v. New York State Dept. of Labor*, 321 F.Supp. 432, 439 (S.D.N.Y.), *vacated and remanded for further consideration*, 402 U.S. 968, 91 S.Ct. 1685, 29 L.Ed.2d 133, *reaff'd on remand*, 333 F.Supp. 341 (1971) *aff'd mem.*, 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), found that New York state's unemployment compensation program was not violative of due process, noting that first level appeals were decided in an average of 45 days. In *White v. Mathews*, 434 F.Supp. 1252, 1261 (D.Conn.1976), *aff'd*, 559 F.2d 852 (2d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), however, the district court concluded that an average delay in Connecticut of 211.8 days in the rendering by an administrative law judge of decisions regarding disability benefit claims was violative of due process. The Second Circuit affirmed the district court's decision on statutory grounds. In the present case, the record does not reveal the average time for decision of second level appeals.

We recognize that significant hardships may result to those individuals whose benefits have been erroneously denied and who must wait over 60 days for a reversal by the Board of Review of their initial ineligibility determinations. However, on this appeal, we are not called upon to address the issue of whether individual cases involving unreasonable delays in processing second level appeals might give rise to a due process violation. We are concerned, rather, with the overall adequacy of the procedures provided. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth finding process as applied to the generality of cases, not the rare exceptions." *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976).

25. Since there is a limited federal budget for all social welfare programs, more stringent requirements applicable to second level appeals may well have the effect of shifting funds used for the administration and processing of first level appeals.

At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significant-

■ Our consideration of the due process factors set forth in *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903, leads us to conclude that the Secretary's current regulation, insofar as it affects the rate of disposition of second level appeals in Pennsylvania, does not violate due process. The private interest in the prompt disposition of second level appeals is significantly weaker than the interest in a prompt initial hearing. The procedures afforded during the first appeal level minimize the risks of erroneous derivations at the second level, and we are not convinced on the basis of the present record that the alternative second level regulations would further reduce those risks. Finally, the administrative and economic burden on the federal government of promulgating and implementing an alternative regulation of the sort sought by the *Wilkinson* class would not be insubstantial. Taken together, these factors establish the constitutional validity of the current regulation.

## V.

In conclusion, we hold that this appeal is not moot. The Secretary's regulation governing second level appeals is rational, consistent with the Social Security Act, and valid under the due process clause. The order of the district court will therefore be affirmed.

___

ly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited.

*Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (citation omitted).

